**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**JUANA HERNANDEZ, on behalf of**
**NEVAEH MIDREY SERENITY JONES,**

        Plaintiff,

vs.                                        No. CIV 10-833 LFG

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Juana Hernandez's ("Hernandez") Motion to Reverse and Remand for Payments of Benefits, or in the Alternative, for Rehearing [Doc. 17], filed March 4, 2011.  Hernandez filed an application for Supplemental Security Income ("SSI") on behalf of her baby daughter Nevaeh Midrey Serenity Jones ("Nevaeh"), who was born March 20, 2007, and would be about four years old at this time.  The Commissioner of Social Security issued a final decision denying SSI, finding that Nevaeh not disabled in the first or second year of her life.  The Commissioner filed a response to Hernandez's Motion [Doc. 18], and Hernandez filed a reply [Doc. 19].  Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court denies the motion and dismisses the case with prejudice.

## I.    PROCEDURAL RECORD

Nevaeh's birth on March 20, 2007, was premature by about two months.  At birth, she weighed about three pounds and had various complications. [AR 21, 43, 207, 357.] Nevaeh was

discharged from the hospital on May 7, 2007, with a "guarded" prognosis. [AR 211.] On May 18, 2007, just two months after her birth, Hernandez, filed an SSI application, claiming her baby was disabled as of her birth date, due to the effects of the premature birth and necrotizing enterocolitis.[1] [AR 21, 98.] Nevaeh's SSI application was denied at the initial and reconsideration levels. [AR 66, 67.] On February 25, 2009, the ALJ conducted an administrative hearing, at which point Nevaeh was almost two years old.[2] [AR 47.] Hernandez, the mother, was present at the hearing, with counsel. [AR 41.] Nevaeh was not required to attend. On October 9, 2009, the ALJ issued a decision finding Nevaeh not disabled in accordance with the sequential evaluation used for children under the age of 18. [AR 18-35.] Thereafter, Hernandez filed a timely request for review. On August 11, 2010, after reviewing additional evidence, the Appeals Council denied Hernandez's request for review and upheld the final decision of the ALJ. [AR 1-4.] On September 8, 2010, Hernandez filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Hernandez received good prenatal care but her pregnancy was complicated by gestational diabetes and maternal hypertension. [AR 346.] Hernandez is married to Nevaeh's father, and both parents participated in Nevaeh's therapy. [AR 335.] The parents quickly became concerned about a number of issues, including Nevaeh's behavioral issues, prolonged crying, inability to sleep, and delayed motor skills. Hernandez has two other children from a different father who are 9 and 11 years old. The half-brothers have attention deficit hyperactivity disorder ("ADHD"), or learning

---

[1] Necrotizing enterocolitis ("NEC") is "[a] gastrointestinal disease that mostly affects premature infants. . . . [I]t involves infection and inflammation that causes destruction of the bowel (intestine) or part of the bowel." http://kidshealth.org/parent/medical/digestive/nec.html (May 12, 2011); Dorland's Illustrated Medical Dictionary, p. 632 (31st ed.).

[2] Nevaeh's age is often adjusted to the date she was actually due, May 25, 2007. [AR 357.]

difficulties, and asthma. [AR 530.] By late 2009, Nevaeh met the medical criteria for having ADHD

even though she was very young. [AR 533-37.]

Both of Nevaeh's parents have their GEDs.  Hernandez stays at home with the children, and

the father was working two jobs as of December 2009. [AR 531.]

## II.   STANDARDS FOR DETERMINING DISABILITY FOR CHILDREN UNDER AGE 18

The Tenth Circuit Court of Appeals described the sequential evaluation used for children

under the age of 18 as follows:

> A child under eighteen years of age is "disabled" if the child "has a
> medically determinable physical or mental impairment, which results
> in marked and severe functional limitations, and which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months." 42 U.S.C. §
> 1382c(a)(3)(C)(I).  A sequential three-step process guides the
> Commissioner's determination of whether a child meets this criteria.
> The administrative law judge ("ALJ") must determine, in this order,
> (1) that the child is not engaged in substantial gainful activity, (2) that
> the child has an impairment or combination of impairments that is
> severe, and (3) that the child's impairment meets or equals an
> impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404. 20
> C.F.R. § 416.924(a).

Briggs ex rel. Briggs v. Massanari, 248 F.3d 1235, 1237-38 (10th Cir. 2001).

At step 3, the ALJ initially determines whether the impairment meets the requirements of

a listing by satisfying "all of the criteria of that listing, including any relevant criteria in the

introduction.  20 C.F.R. § 416.925(c)(3). If, however, the child's impairment fails to meet the

criteria, the ALJ determines whether it "medically equal[s] the criteria of a listing." 20 C.F.R. §

416.925(c)(5).

> An impairment is the medical equivalent of a listing "if it is at least
> equal in severity and duration to the criteria of any listed
> impairment." 20 C.F.R. § 416.926(a). Medical equivalence can be
> found where the child has an impairment included in the listings, but

"do[es] not exhibit one or more of the findings specified" for the
particular listing examined, or "one or more of the findings is not as
severe as specified," yet there are "other findings related to [the]
impairment that are at least of equal medical significance to the
required criteria." 20 C.F.R. § 416.926(b)(1)(i)-(ii). Last, if the
impairment neither meets nor medically equals any listing, there must
be a determination of "whether it results in limitations that
*functionally equal* the listings." 20 C.F.R. § 416.926a(a).

Wilson v. Astrue, 2011 WL 824689, *4 (N.D. Okla. Mar. 2, 2011) (emphasis added) (unpublished).

In other words, if a child's impairment is functionally equivalent to a listing, the child is disabled.

"For an impairment to be the functional equivalent of a listing, it must be of listing-level

severity because it results in either 'marked'[3] limitations in two domains of functioning or an

'extreme'[4] limitation in one domain. Id. (*citing* 20 C.F.R. § 416.926a(a)). In assessing whether a

child is "functionally limited," the ALJ considers all relevant factors outlined in 20 C.F.R. §§

416.924a, 416.924b, and 416.929, including: "(1) how well the child initiates and sustains activities,

how much extra help [s]he needs, and the effects of structured or supportive settings; (2) how the

child functions in school; and (3) how the child is affected by [her] medications or other treatment."

Id; Briggs, at 1237-38 (*citing* 42 U.S.C. § 416.926a(a)(1)-(3)).

In addition, the ALJ examines six broad areas in determining if the child functions

"appropriately, effectively, and independently" . . . compared with the abilities of other unimpaired

children of the same age. 20 C.F.R. § 416.926a(b)(1).

---

[3]A "marked" limitation in a domain is defined as an impairment that interferes seriously with the
child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).

[4]An "extreme" limitation in a domain is defined as an "impairment(s) [that] interferes very
seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. §
416.926a(e)(3)(i). "Extreme" refers to the worst limitations, but "does not necessarily mean a total lack or
loss of ability to function." Id.

> The six domains are "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Here, the ALJ properly applied the three-step sequential evaluation for children in deciding Nevaeh was not disabled. [AR 19.] In addition, the ALJ extensively reviewed the definitions of marked and extreme limitations as applied in the context of the three-step evaluation. [AR 20.] However, Hernandez primarily disagrees with the ALJ's findings with respect to limitations in the six domains.  In other words, she takes issue with the ALJ's determinations of functional equivalence. [Doc. 17.]

## III.   <u>STANDARD OF REVIEW</u>

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  <u>Langley v. Barnhart</u>, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  <u>Doyal v. Barnhart</u>, 331 F.3d 758, 760 (10th Cir. 2003); <u>Langley</u>, 373 F.3d at 1118; <u>Hamlin v. Barnhart</u>, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  <u>Hamilton v. Sec'y of HHS</u>, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  <u>Langley</u>, 373 F.3d at 1118; <u>Hamlin</u>, 365 F.3d at 1214; <u>Hargis v. Sullivan</u>, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. <u>Hamlin</u>, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's

function is to determine whether the record as a whole contains substantial evidence to support the

Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d

at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what

the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence.  Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must discuss the uncontroverted evidence he
> chooses not to rely upon, as well as the significantly probative
> evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If

supported by substantial evidence, the decision of the Commissioner is conclusive and must be

affirmed.

After "careful consideration of the entire record" [AR 21], the ALJ denied Hernandez's

request for SSI.  In so concluding, the ALJ made the following findings: (1) that Nevaeh was a

newborn/young infant on May 18, 2007, the date the SSI application was filed, and that she was a

one-year old child on March 20, 2008; (2) given her age, she did not perform substantial gainful

activity; and (3) Nevaeh had severe impairments due to the effects of premature birth, necrotizing

enterocolitis, and a behavioral disorder that relates primarily to Nevaeh from age one to the date of

the ALJ decision. [AR 21.] The ALJ determined that Nevaeh's impairments or combination of

impairments did not meet or medically equal listing requirements, and further that the impairments

of combination thereof did not "functionally equal" the listing requirements. [AR 21.]

The ALJ's decision discusses the degree of limitation as to each of the six functional

domains, along with Nevaeh's symptoms and medical records, for two separate periods of time: (1)

6

age 0-1; and (2) age 1-present (date of ALJ decision, *i.e.,* until about the age of 2½) .  The ALJ also made credibility findings, determining that while the underlying physical or mental impairment could reasonably be expected to produce Nevaeh's symptoms, the testimony at the hearing concerning the intensity, persistence and limiting effects of the symptoms was not credible to the extent that the limiting effects conflict with the ALJ's detailed analysis of the six domains. [AR 22.]

Because the ALJ found a marked limitation in only one of the six domains for age 0-1, the ALJ concluded Nevaeh was not functionally limited during this time frame.  The same is true for age 1-present.  The ALJ found a marked limitation in only one of the six domains for this time frame.  Thus, the ALJ concluded Nevaeh was not disabled. [AR 22-34.]

## IV.   **MEDICAL HISTORY AND BACKGROUND**

There are only three years of medical records for Nevaeh since she was born in 2007.  However, these records are extensive due to the various intensive therapies and evaluations she received during this period.

### *2007 Records*

Nevaeh was born on March 20, 2007, almost two months early.  She had a number of complications due to her premature birth.  She needed to use mechanical ventilation for four days, followed by a CPAP device for two days for apnea.  She suffered one episode of bradycardia (slowness of heart) and was treated for a large patent ductus arteriosis ("PDA") or heart impairment. Nevaeh generally responded well to conservative treatment while in the hospital.  However, she underwent a surgical ligation for the PDA on April 7, 2007, that she tolerated well. [AR 276.]  Her diagnoses at discharge were necrotizing enterocolitis, which did not require surgical intervention, apnea, bradycardia of prematurity, and osteopenia.  She passed a hearing screening, and an

7

ultrasound of the head showed no abnormalities. [AR 357.]  She weighed 6 pounds, 9 ounces when

discharged on May 7, 2007.[5] [AR 207-11.]

On May 7, 2007, Nevaeh's developmental status was assessed to determine her eligibility

for early intervention and developmental preventive intervention services. [AR 357.] Nevaeh was

alert and at times overly alert after feeding and care.  She responded to visual and auditory stimuli.

Her motor movements were fairly smooth.  She was bottle and breast feeding well.  Nevaeh's

development appeared typical for her gestational age then.  She was eligible for the New Mexico

Family Infant Toddler program services due to her preterm birth, surgery for PDA and necrotizing

enterocolitis which placed her at increased risk for developmental concerns.  [AR 212, 357.]

On May 18, 2007, Hernandez filed the SSI application on Nevaeh's behalf, alleging

disability from birth. [AR 98.]

A form, dated May 21, 2007, indicates Nevaeh was taking Ranitidine (used to treat GERD)

and Mylicon Drops (used to treat gas in infants). [AR 247.]

On June 1, 2007, Hernandez completed a function report for Nevaeh, who was less than a

month old (adjusted age).  Nevaeh had been seen for acid reflux and took medications for that

problem.  She was sensitive to lights, loud noises and holding. [AR 117-136.]

On June 6, 2007, Dr. Lloyd Schneiderman evaluated Nevaeh's records with respect to her

initial application for SSI.  He found she had severe impairments but nothing that met a listing.

While he found no limitations in five of the domains, he found a marked limitation in her health and

---

[5]PDA is "abnormal persistence of an open lumen in the ductus arteriosus after birth, the direction of flow being from the aorta to the pulmonary artery, resulting in recirculation of arterial blood through the lungs." Dorland's Illustrated Medical Dictionary, p.579 (31st ed).

physical well being. [AR 222-25.] On this same date, Nevaeh's initial application for SSI was denied. [AR 65.]

On June 12, 2007, Hernandez filed a request for reconsideration, stating that her daughter still had many difficulties due to the premature birth. [AR 71.]

On June 20, 2007, Nevaeh was evaluated at the UNM Children's Hospital, Department of Pediatrics with respect to neurodevelopmental eligibility. Nevaeh was described as very alert. She appeared to focus on faces and voices but became over stimulated by her surroundings. She did not always respond well to being comforted. Her functioning in the area of social/emotional behavior was atypical for an infant her age due to her difficulty calming and regulating her level of composure. [AR 351.] Her development in the area of pre-cognition/language/communication was difficult to assess at her young age, but she was found typical for her age. With respect to sensorimotor/neuromotor skills, Nevaeh was described as very alert. Her muscle tone was mildly high. She displayed typical responses to auditory and visual stimuli. Her capacity to calm and fall asleep appeared difficult. Her development of motor control appeared normal. Her "regulation of state" and capacity to calm and comfort were impacted. Her feeding pattern was not typical for her age and was impacted by her gastric discomfort. [AR 351.]

With respect to adaptive behavior, Nevaeh was described as agitated and not able to be comforted easily. Hernandez reported Nevaeh had trouble falling asleep and being content for long. Her growth, however, was good for her adjusted age. She was considered eligible for the Family Infant Toddler (FIT) services based on her preterm birth and difficulties with feeding and regulation. [AR 354.]

Nevaeh was seen at Presbyterian on July 25, 2007. Her mother reported she had been crying for more than an hour every day and resisting sleep. She did not like noise or lights. [AR 239.]

On August 31, 2007, a consulting physician for disability services, Jon Aase, evaluated Nevaeh's medical records for purposes of the request for reconsideration. [AR 314.] He found serious impairments but nothing that met listing requirements.  He found no limitations in the first five domains, and a "less than marked" limitation in the area of health and physical well being.  He noted that both the necrotizing enterocolitis and the PDA were resolved after appropriate treatment.  Her catch-up growth had been good. [AR 314-17.] The request for reconsideration was denied on this date. [AR 67.]

On September 5, 2007, Nevaeh was again evaluated by UNM Department of Pediatrics. Nevaeh's parents were very concerned about her prolonged crying. [AR 346.] She appeared very alert and over stimulated at times.  She did not respond well to attempts to comfort her and was fearful of quick changes.  Nevaeh responded better to a slow approach.  She had difficulties with self-calming and was highly sensitive. [AR 347.] She was having some trouble with sensorimotor/neuromotor areas.  She was referred to an ophthalmologist to assess her eye muscle balance.  Nevaeh still had trouble sleeping and was fearful of the dark.  She was assessed with GERD. [AR 348.] While her next appointment for an evaluation was December 5, 2007, there is no corresponding medical record in the administrative record.  [AR 349.]

On October 3, 2007, there are "Family Notes" from the UNM Department of Pediatrics, stating that Nevaeh needed developmental monitoring and supportive care.  She had extremely long periods of crying and trouble sleeping.  She was described as a "high needs" baby.  She was to be followed on a monthly basis, with her next appointment scheduled for October 17 or October 26. However, there are no records that Nevaeh was seen on either October date. [AR 344.]

On October 6, 2007, Nevaeh was seen by Dr. Goldblum, an ophthalmologist. She was about six months old then. Although she had mild to moderate astigmatism, her eyes were healthy and her visual acuity was good. [AR 373.]

An updated disability report from around this time indicates Nevaeh continued to cry for long periods and was insecure. She spit up formula and could not digest food. She was afraid of movements. [AR 143.]

### *2008 Records*

On January 16, 2008, Nevaeh was seen for a follow-up developmental evaluation at UNM Department of Pediatrics. [AR 340.] A speech pathologist, occupational therapist, and physician all signed off on the report. Nevaeh's care had been followed through the Care Continuity Program "but repeated no shows and cancellations by family have prevented out patient care (either at home or at visits in SBC)." Nevaeh's parents said she was growing well. Nevaeh did not like to lie on her stomach and roll but loved to play with her brothers. She was very aware of people today and smiled. Her cognition and communication skills were evaluated as typical. She had delayed motor skills. Sitting was a problem for her. [AR 340-41.]

On January 31, 2008, a home visit was canceled because Hernandez was not home. [AR 342.] Follow-up calls to Hernandez were not successful. Due to repeated no shows and cancellations, Nevaeh's enrollment in the Developmental Care early intervention program was to be dropped. [AR 342.]

A letter from occupational therapist Duran to Nevaeh's primary care doctor, Dr. Napoleone, dated February 22, 2008, states that Duran assumed Nevaeh's parents did not want to have the early intervention services based on their lack of contact. [AR 338.]

On March 19, 2008, Nevaeh was provided a follow-up developmental evaluation, so it appears that Hernandez contacted the program for services again. [AR 335.] Nevaeh's adjusted age at this appointment was almost 10 months. The providers described Nevaeh as having mild motor delays in January related to her limited experience lying on her stomach and getting into a sitting position independently. Nevaeh had done well since her hospital discharge and her parents had done a good job of keeping her healthy. Her parents continued to be concerned about her delayed motor skills, fearfulness and "fussiness." Nevaeh was observed to use her arms to get attention and support and was very persistent in her attempts to have her parents hold her. She was not as self-reliant as expected. Her cognition/communication level was normal for a 9 month old baby. She was very playful. She had "beautiful" social communication skills. Her sensorimotor/neuromotor skills were typical of an 8 month old. Her muscle tone was normal. She was tentative and resistant to guided movement. [AR 335.] The care providers felt that Nevaeh's growth was normal and her early communication skills were age appropriate. Her exploration with her hands should increase as she became more stable sitting. Nevaeh's gross and fine motor skills were mildly to moderately delayed. [AR 337.]

On April 11, 2008, there is Baby Steps early intervention evaluation summary signed by a nurse and the physical therapist. [AR 365.] Nevaeh's cognitive development was assessed at below average. [AR 366.] Her communication skills were the age equivalent of an 8 month old child and, therefore, below average. She liked to laugh and moved her body to music. She did not stop when told "no." She was below average in her social emotional development. She did not play simple games and was not able to calm herself. She was easily upset if she fell. Nevaeh's adaptive behavior was poor. She had been able to sleep through nights for two months. The providers wrote that Nevaeh was on Medicaid which enabled easy and quick access to medical care. [AR 367.]

"Unfortunately, Nevaeh has been turned down for [SSI] 2 times." [AR 367.] In sum, Nevaeh was ranked below average in 4 domains of development and had a poor rating in adaptive behavior. Therefore, she qualified for early intervention services under the developmental delay category.

On April 16, 2008, Nevaeh was re-evaluated by UNM's Department of Pediatrics. [AR 331.] She was 10 months, 22 days at her adjusted age.  Assessments were performed.  Regarding the behavior/social emotional area, Nevaeh was observed to cry loudly and throw herself back in order to protest.  She was beginning to understand the concept of "no."  She could be distracted from "her little tantrums" by changing an activity or ignoring her behavior.  The therapists stated it was important for her to learn to express less anger.  Regarding her pre-cognition/communication skills, she was rated as normal in problem solving and communication.  Of less significant concern was her "mildly diminished" use of hands to explore and play with toys. [AR 331.] Regarding her sensorimotor/neuromotor skills, she did not seem to like to crawl.  Her balance in sitting had improved.  She tended to fall either to the side or back.  Her loss of balance seemed to contribute to her limited tolerance for not being in control of movements, which made her cry. [AR 332.] She did not pull herself up to stand and liked her parents to pull her up.  She wanted to move and be walked.  Her growth was normal, and Nevaeh looked healthy and robust.  The care providers believed Nevaeh's problem-solving and communication skills were improving but that increased body control would help.  Her motor skills continued to be delayed and interfered with her learning to move better. [AR 333.]

On April 28, 2008, Chavez, a developmental therapist ("DT"), made a home visit and noted that Nevaeh appeared to be improving with language skills. [AR 389.] On April 30, 2008, Maidment, the physical therapist ("PT"), observed that Nevaeh was alert and awake.  She made mimicking sounds and laughed out loud with her brother.  Her parents were concerned with

13

Nevaeh's neediness, inability to calm herself, and slow developmental skills. She ate well but did not feed herself. This record indicates that Nevaeh frequently vomited, related to reflux. Hernandez reported that Nevaeh could cry for hours until the point of vomiting. Nevaeh also hated to have her face touched or her diapers changed. She threw herself back, grabbed at her face, and pulled her hair. She was assessed as being one to three months behind in all areas, including cognitive, communication, social-emotional, physical development, and adaptive behavior. [AR 364.]

There do not appear to be any therapy records in the administrative record from May 2008 to August 2008.

On August 5, 2008, the PT noted that Nevaeh was in good spirits and cooperative. Her father was laid off his job and collecting unemployment. [AR 480.] On August 6, 2008, Hughes, the occupational therapist ("OT"), reported that Nevaeh was calm during the majority of the visit. She had a brief episode of agitation but showed a good response to play. The OT worked with her about objects that caused aversive behavior. Nevaeh was able to calm herself in a few minutes. [AR 479.]

On August 8, 2008, the DT reported that Nevaeh "engaged quickly," showed great interest in playing with a bank, and was playing with toys for longer amounts of time. [AR 475.] Hernandez had taken her to Urgent Care where Nevaeh was diagnosed with asthma. She was to receive nebulizer treatments. Nevaeh had difficulty sleeping in the night or day.

On August 12, 2008, the PT reported that Nevaeh was in good spirits and cooperative. The nebulizer treatments had caused anxiety. The PT encouraged Hernandez not to worry about "every little thing" that Nevaeh was or was not doing. Nevaeh showed some hesitancy and lack of confidence in walking. [AR 473.]

On August 13, 2008, the OT reported Nevaeh was in a good mood, without any significant episodes of agitation or pain. She had started the nebulizer treatments, which caused increased

14

agitation and possibly hyperactivity.  She showed auditory and tactile aversions as well as an inability to self calm.  But, Nevaeh had not shown a significant behavior episode during recent therapy sessions.  Her fine motor skills were improving.  Hernandez asked for a letter explaining the purpose and goals of OT. [AR 472.]

On August 15, 2008, the DT visited the home.  Telge, the speech therapist ("ST") was also present.  Hernandez reported language skills problems and the possibility of a stutter.  Her older child had language issues and was receiving services.  The ST found Nevaeh's vocalizations were typical for her age.  Hernandez reported that Nevaeh still demanded attention and threw tantrums.  The therapist intended to continue working with Hernandez to help her better read Nevaeh's cues. [AR 471.]

On August 19, 2008, the OT wrote a letter addressed to whom it may concern.  He stated he had seen Nevaeh since June 25, 2008.  She presented with fine motor and cognitive delays as well as auditory, oral and tactile aversions, behavioral issues, and a poor state of regulation.  Nevaeh showed an acute intolerance to many sounds, tactile sensations, and foods.  She had frequent and severe episodes of agitation occurring daily and manifested self abusive behavior and prolonged tantrums lasting several hours.  However, Nevaeh had shown progress in demonstration of goals and increased tolerance of tactile oral and auditory stimuli during therapy.  She continued to show delays and significant behavioral concerns which warranted weekly therapy visits. [AR 361.] While this letter indicates serious concerns with Nevaeh's development, previous and subsequent OT therapy records are not entirely consistent with the OT's letter on this date.

On August 19, 2008, the PT visited Nevaeh who was in good spirits.  Hernandez reported that Nevaeh yelled when she wanted something and was starting to do that until she vomited.  The mother wanted speech therapy for Nevaeh because she only used two words. [AR 470.]

15

On August 20, 2008, the OT noted that Nevaeh was irritable at points, but mostly in a good mood. There were no lasting episodes of agitation. The mother reported that Nevaeh was gagging more frequently and bringing herself to vomit. Nevaeh had not slept well the night before. The OT observed some gagging behavior but was not sure if it was attention seeking or a manifestation of poor self regulation. Nevaeh was visibly less irritated when music was played. [AR 469.]

On August 22, 2008, the DT visited Nevaeh, who she found "quick to engage." Nevaeh was "happy" and "playful." She was absorbed in exploring toys. Her mother was still concerned about her language skills and the possibility of a stutter. [AR 468.]

On August 26, 2008, the DT addressed a letter to whom it may concern. Chavez noted she had been providing special instructions to the family to help stimulate all areas of Nevaeh's development, including cognitive, gross and fine motor skills, problem solving, and emotional/social skills. Nevaeh qualified for weekly visits due to her prematurity at birth. The DT planned to continue to provide these services until age 3 if the parents wished. This letter does not describe how Nevaeh is doing at this point. [AR 360.]

On August 26, 2008, the ST and PT met Nevaeh and her mother at the aquarium. The PT described Nevaeh as being in good spirits. The mother had brought Nevaeh to the aquarium before but had kept Nevaeh in the stroller. Nevaeh was visually attentive to the exhibits and could ambulate up and down ramps or stairs independently. She exhibited some lack of caution. [AR 467.]

On August 29, 2008, the DT met with Nevaeh, who again engaged well. She was very interested in a bank and exhibited strong fine motor skills. Her attention span was expanding. She vocalized grunts and unintelligible words. Her sleep pattern had improved now that she was

sleeping in a "toddler bed." She began to fuss at one point and held up her arms to her mother. She settled down immediately when the DT picked her up. [AR 465.]

On September 2, 2008, Nevaeh had an eye exam. The DT and PT attended the appointment as well. Nevaeh's astigmatism was resolving. The mother spoke about an eviction notice from the landlord. [AR 462.] During the eye exam, Nevaeh became very upset and had to be held down. However, she was quickly soothed. [AR 463, 464.]

On September 3, 2008, the OT saw Nevaeh. She was in a good mood and showed improvement in spending more time on activities. Her fine motor skills had improved as well. She was calm throughout the session. [AR 461.]

On September 4, 2008, the ST wrote a letter addressed to whom it may concern, stating that she was seeing Nevaeh for 60-75 minutes once a week to address significant language delay. [AR 359.] On this same date, the ST found Nevaeh in good spirits and laughing.

On September 5, 2008, the DT found Nevaeh well and in good spirits. She was not fearful about being in a swing. [AR 459.]

On September 6, 2008, the ophthalmologist wrote a letter to Dr. Napoleone about Nevaeh's office visit. He stated her visual acuity was good and that her vision was "improving nicely." [AR 368.]

On September 9, 2008, the PT found Nevaeh mostly cooperative with brief periods when she yelled and became angry. She walked the length of a balance beam with one hand held. She independently stepped over a broom handle. [AR 458.]

On September 10, 2008, the OT noted that the family was packing to move. Nevaeh was calm. She showed some anxiety over packing tape noise. They worked with her and she showed a fairly rapid habituation response and eventually ignored the tape. She calmed readily. [AR 457.]

17

The ST saw Nevaeh a day later.  Hernandez was stressed about the move.  Nevaeh was in good spirits.  She did not yet make animal sounds. [AR 456.]

The next day, the DT saw Nevaeh, who was happy and playful.  She engaged well and smiled often.  She quickly became frustrated when searching through the play bag and began to bang on the toy.  She picked it up and threw the toy.  Throwing things was fairly new according to her mom.  Nevaeh was vocalizing more although her words were unintelligible. [AR 452.]

On September 16, 2008, the PT saw Nevaeh.  She was mostly cooperative but complained some.  She spoke a few words.  The PT concluded Nevaeh had made progress over four months and no longer needed physical therapy once a week. [AR 449.]

The next day, Hernandez reported to the OT that Nevaeh had been fussier, but there were significant stressors including the death of the family dog, the loss of car insurance, and moving.  Nevaeh was calm and in good spirits.  She reacted to family stressors by showing an increase in "baseline agitation."  She showed continued improvement in the quality of play in therapy.  Her fine motor performance was improving, and her anxiety was decreasing. [AR 448.]

On September 18, 2008, the ST found Nevaeh moody but participatory. [AR 447.] The next day, the DT found Nevaeh was engaging well.  She sat with her and played with animal pop-up activity.  Her attention span was longer and Nevaeh was more vocal, but the ST did not hear any intelligible words.  She was overcoming some fears and progressing well. [AR 446.]

On September 24, 2008, the OT reported Nevaeh expressed some anxiety although she was mostly calm.  She initially demonstrated anxious-avoidance reactions but habituated and approached the objects.  She showed good tolerance of loud, banging or popping noises and laughed. [AR 445.]

The next day, the ST stated Nevaeh used words.

18

Several days later, the DT saw Nevaeh along with the nurse. The family found a new apartment. Nevaeh was very sociable and wanted to be held. She played with her toys, but showed some impatience. She vocalized but only a few words could be understood. She was having sleep problems according to her mother. [AR 442.]

The nurse's notes from that visit state Nevaeh was playing well and affectionate. Her mother reported sleep problems and excessive crying. However, the nurse did not observe any crying or irritability that day. The nurse wrote that Hernandez had many health problems, including gestational diabetes that had not been resolved. The mother did not test her blood sugars but did take her medications. She was being treated for hypertension. The nurse noted that Hernandez, at age 28, had a lot of health issues and wondered if the baby's excessive crying, as reported, might be interpreted "by this hypertensive mom" as more than it is. [AR 443.]

On September 30, 2008, the PT saw Nevaeh and found her in good spirits until the end of the session when she was tired and irritable. Nevaeh had started running but had not jumped. She could kick a ball. She allowed the PT "to cuddle her" a little at the end. [AR 441.]

On October 1, 2008, the OT reported Nevaeh demonstrated minimal signs of aversion toward several aversive stimuli. She could interact well and tolerate noises. [AR 440.]

The next day, the ST found Nevaeh was more focused on play that day and also that she spoke a few words. She was able to follow instructions and correctly identify body parts. [AR 4329.]

On October 7, 2008, the PT stated Nevaeh was "jabbering," laughing, and cooperative. She was fearless and walked off the sofa. She danced. When frustrated, Nevaeh acted out by biting, scratching, pinching, or hitting. But, she was playful this day.

On October 8, 2008, the OT reported that Nevaeh was calm and showed improvement in overall anxiety. [AR 437.]

On October 9, 2008, the DT noted that the family was still looking for a house to rent and that Hernandez was frustrated with the situation. The landlord wanted the family out. Nevaeh was in good spirits. She showed a desire to communicate and vocalize although most words were unintelligible. She said a few words and showed curiosity. [AR 435, 436.]

On October 13, 2008, the ST noted that Nevaeh was sick. She was in good spirits but appeared to stop breathing after a sip from a cup. She turned blue around the lips. The ST turned her over her knee and patted her back five times. There was no choking, and she recovered. It was difficult to have Nevaeh attend to a single task for as long as a minute. She was more aggressive today and drew back her hand to hit the ST. She yelled, too, and did not demonstrate understanding of sequencing. [AR 433.]

Several days later, the OT noted that Nevaeh had a cold and was notably more hyperactive. [AR 432.]

On October 17, 2008, the DT found Nevaeh in good spirits and very vocal. She continued to scream for objects she wanted and would not stop even when she got them. She was working hard at communicating by pointing, screaming, and using signs. Her cues were not always clear, and she was frustrated. Her mother reported no improvement in her sleep patterns. [AR 431.]

Three days later, the DT noted Nevaeh engaged quickly and laughed. She was excited when her brothers arrived and was unable to focus for long. She was very sociable and was vocalizing more. [AR 430.]

The ST canceled her visit this week due to illness. [AR 488.]

On October 21, 2008, the PT saw Nevaeh, who she described as being intermittently irritable.  Hernandez reported that Nevaeh was aggressive for no apparent reason, e.g., she was biting, hitting, pulling her hair, and throwing things at people.  She was still afraid of noise.  She demonstrated independent ability to step onto and off a beam but took no steps. [AR 429.]

On the next day, the OT noted that the family had been moving.  Nevaeh was in a good mood.  She showed progress in her ability to tolerate aversive objections and improvement with aversive stimuli.  She was demonstrating anxiety with the packing tape again according to her mother. [AR 428.]

On October 28, 2008, the PT found Nevaeh initially upset, crying, and not feeling well.  She was given some Tylenol and antibiotics, and was willing to engage in play.  She spontaneously kissed the PT's leg.  She also waved and said hi.  She was used to sleeping in her new house.  Her play was more focused, but her running was "immature."  [AR 427.]

The next day, the OT reported Nevaeh was more irritable after the move.  She shouted and whined more.  She wandered from the play area.  She demonstrated greater sensitivity to aversive stimuli. [AR 426.]

The ST saw Nevaeh in the new home on October 30.  Hernandez was concerned that Nevaeh was not adjusting to the new home.  She demonstrated increased yelling and temper tantrums.  She was not sleeping or eating well.  She paid limited attention to tasks.  She acted out and was screaming. [AR 425.]

The DT noted that Nevaeh was not as active the next day.  She was sad or ill.  The mother reported this is the way Nevaeh had been since moving.  She was feeling "out of sorts" with the new house, and was clinging and crying.  Nevaeh was irritable in the session and showed no interest in playing. [AR 424.]

21

On November 4, 2008, the PT found Nevaeh stubborn and uncooperative except for interactions with her father.  She was having some spiking fevers due to teething. [AR 423.]

On November 5, 2008, the OT found Nevaeh in a good mood, although she reportedly was not sleeping and irritable.  She was more distracted on this occasion and spent less time overall on individual activities.  The mother stated Nevaeh had engaged in more regressive and maladaptive behaviors since moving.  Her aversive tendencies were improving and her fine motor coordination also had improved. [AR 422.]

A November 5, 2008, record indicates that physical therapy sessions were decreased to two per month. [AR 488.]

On November 12, 2008, the father reported to the OT that Nevaeh had been less agitated and was settling into the new home.  She demonstrated improvement in her ability to insert shapes into holes. [AR 420.]

On November 13, 2008, the ST found Nevaeh fussy and moody. [AR 419.]

On November 16, 2008, the ST saw Nevaeh at home with both parents present.  She was engaging in head banging and screaming.  The regression reportedly was due to the move.  The ST observed Nevaeh bang her head 4-5 times on the door, wall, floor and couch when frustrated or upset.  She did not focus on play much but did a few somersaults. [AR 421.]

On November 13, 2008, the DT stated Nevaeh was not as responsive as prior times.  She was not interested in playing and was banging her head. [AR 416.] Later that day, the DT saw Nevaeh again and thought she might be sick.  Nevaeh was fussy and cried.  She followed her father around, and stayed close to her mother. [AR 417.]

On November 18, 2008, the PT saw Nevaeh, who was uncooperative.  Nevaeh was teething.  She was yelling and not sleeping according to Hernandez. [AR 418.]

The next day, the OT found Nevaeh more irritable than usual.  She had been fussier since seeing a dentist and was running a fever the day before.  She engaged in more head banging.  She was more distracted. [AR 415.]

On November 20, 2008, Hernandez reported to the ST that it had been a bad week.  She was frustrated with Nevaeh's head banging.  The ST observed Nevaeh to scream and bang her head more frequently.  She was less engaged than other visits.  She was frustrated during play.  During much of the session, Nevaeh acted out and was evasive.  There was frequent head banging.  [AR 414.]

On November 26, 2008, the OT noted Nevaeh whined more frequently and had more temper tantrums than usual.  The parents expressed that her agitation was at a higher threshold than before their move to the new home.  The tantrums were shorter than they had been during earlier visits.  Nevaeh was more receptive to distraction and re-direction today.  She calmed fairly quickly and seemed all right. [AR 413.]

On November 28, 2008, the ST saw Nevaeh and her mother at the aquarium for a community outing.  The ST reported that Hernandez was on the phone most of the time and kept Nevaeh in the stroller to control her.  Nevaeh vocalized words but did not engage with playmates because she was kept in the stroller, which the ST found unfortunate. [AR 412.]

On December 1, 2008, the ST saw Nevaeh at home.  She was more focused and calm.  But, Hernandez reported bad behaviors.  The ST observed no frustration on Nevaeh's part during play and no head banging.  Nevaeh was tired at the end of the session. [AR 411.]

On December 2, 2008, the PT found Nevaeh mostly cooperative and in good spirits.  She tolerated activities well. [AR 410.]

On December 3, 2008, the nurse made a home visit and the OT was present.  Nevaeh had a cough and was on nebulizer treatments.  Her lungs were clear at this time, but she coughed.  She was

combative with the nebulizer treatments.  The nurse noted that the brother had attention deficit disorder and was taking medications for it. [AR 408.] The OT reported Nevaeh was in a good mood and engaged readily in therapy.  She was better engaged on this day.

On December 4, 2008, the DT visited the home.  Hernandez reported that Nevaeh did not sleep well and awoke five times a night on average.  She was banging her head on the wall, furniture, and floor when she was upset.  Hernandez was frustrated.

Later that same day, the DT made another home visit.  Nevaeh was irritable and showed little interest in playing.  She wanted attention from her parents.  She yelled. [AR 407.]

On December 8, 2008, the ST stated Nevaeh was engaging in preliteracy activities.  She could identify objects by shape and color.  She was more focused than in earlier sessions. [AR 404.]

On the same day, the DT found Nevaeh in good spirits.  She did not have much interest in playing with toys.  She climbed on the couch, but did not cry or scream.  The DT discussed the importance of consistency with the parents and that they not respond to screaming when Nevaeh wanted something. [AR 405.]

On December 11, 2008, the PT and DT accompanied Nevaeh and her parents to an auditory screening conducted by Lauri Ross-Brennan. [AR 383, 403.] Hernandez reported to Ross-Brennan that Nevaeh had an aversion to sounds.  She startles, cries, bites, and hits herself in response to sounds.  Ross-Brennan could not administer a hearing test because Nevaeh was too young.  She was extremely active during the session.  She demonstrated auditory defensiveness in addition to disordered speech and language.  Ross-Brennan recommended speech therapy and auditory integration training ("AIT").  She diagnosed Nevaeh with an impairment of auditory perception. The AIT was a 2-week intensive treatment designed to strengthen and balance the auditory system. [AR 383.]

24

On December 16, 2008, the DT noted she probably would cancel all visits while Nevaeh was engaged in AIT.  Nevaeh was in good spirits on this day and played independently.  There was no screaming. [AR 402.]

On December 17, 2008, the OT saw Nevaeh, who readily engaged in therapy.  She was not agitated and could focus.  There was no anxious-avoidant response. [AR 401.]

On December 19, 2008, the providers had a team meeting.  They noted that Nevaeh was starting AIT and that her parents continued to feel frustrated with her behaviors. [AR 398.]

On December 22, 2008, the ST saw Nevaeh at home.  She was moody and not participatory.  Nevaeh exhibited a temper tantrum and gagged, nearly vomiting.  Her mother thought it was a behavioral response to Hernandez not allowing Nevaeh to have gum.  Nevaeh was upset and the ST could not re-direct her. [AR 394.]

On December 29, 2008, the ST saw Nevaeh again.  She was in good spirits and played with a single toy for 25 minutes.  This was the best session in a month. [AR 393.]

### *2009 Records*

On January 5, 2009, the DT attended the appointment for audiology integration with Nevaeh and her family.  At first, Nevaeh would not wear her earphones and was upset, but after 15 minutes, she left them on.  She seemed to calm more when her brother sat near her. [AR 392.]

On January 7, 2009, the nurse visited Nevaeh's home while Nevaeh was at her AIT appointment with her father.  Hernandez stated that Nevaeh slept one hour more at night than usual.  The nurse advised Hernandez to get her (the mother's) diabetes under control because it affected other conditions.  Hernandez did not seem to understand or be concerned about the impact of diabetes.  She was resistant to changing her eating habits. [AR 391.]

On January 14, 2009, the PT attended the AIT appointment with Nevaeh, her brother, and her mother. The brother was receiving the same treatment. Nevaeh appeared to be adjusting to the head phones and did not try to remove them as much. She focused on playing with several toys and was not irritable. She slept well the night before, but her mother reported she was more irritable in the last few days and less tolerant of riding in the carseat. She was screaming, hitting things, and throwing objects at people. She would bang her head when very upset. [AR 390.]

A number of appointments were canceled in late January due to illness. [AR 487-89.] On January 26, 2009, the DT visited Nevaeh at home. She had been ill for several days. She had been vomiting and was irritable. However, the DT did not find her irritable during this home visit. Nevaeh played with toys and danced. She occasionally needed help. She was very interested in filling a bag with puzzle pieces. She vocalized but there were no intelligible words. [AR 388.]

On January 28, 2009, the ST and OT saw Nevaeh. Nevaeh was able to identify shapes and vocalized the "meow" sound. She identified body parts with 75% accuracy. [AR 386.] The OT found she was in a good mood and demonstrated minimal anxious avoidant behavior. [AR 387.]

On January 29, 2009, the PT saw Nevaeh. Hernandez reported Nevaeh was worse since AIT and described Nevaeh as a "monster." She was not sleeping, was more aggressive, and cried for four hours non-stop. Hernandez was depressed and frustrated. She was informed it could take six months before she saw positive changes from AIT. The PT made multiple telephone calls to find neuropsych testing for infants. Hernandez was concerned that Nevaeh had attention deficit disorder ("ADD") or Attention Deficit Hyperactivity Disorder ("ADHD"). Nevaeh was able to play that day. [AR 385.]

The PT provided an addendum to the January 29 notes, in which she stated that Hernandez reported there was no pattern nor predictability to Nevaeh's tantrums. The family stated they had

a video recorder and had thought about recording Nevaeh during a "meltdown." The PT recommended she do so to show it to the doctor. [AR 488.] The records do not indicate this was done.

On February 9, 2009, Nevaeh was seen by Dr. Napoleone for behavioral concerns. At this point, Nevaeh was 22 months old. The PT accompanied Nevaeh and her mother to this appointment. Hernandez reported having trouble controlling Nevaeh's behavior and stated it severely impacted the mother's life. Nevaeh did not sleep through the night. She hit things and screamed and had severe temper tantrums. Nevaeh frequently vomited when agitated – at least once a day but no more than two times daily. The therapist thought the vomiting was behavioral in nature but her mother was concerned that it was because of her GERD. Hernandez tried using time-outs but they did not help. [AR 496.]

Twenty-two month old Nevaeh was recently evaluated at a 17-month level for gross motor skills; 15-month level for expressive language skills; 16-month level for receptive language skills; and 20-month level for her cognitive level. [AR 496.] She was very active during the exam. She hit her brother and ran to hit the doctor. She was "very fussy and inconsolable" during the exam. Her past medical history was positive for developmental delay and GERD. Dr. Napoleone referred Nevaeh to Dana Hill for a neuropsych evaluation. She and her family were referred to Joelle Haldeman-King with Presbyterian Behavioral Health for counseling. [AR 497.] At this time, Nevaeh was prescribed three medications for asthma and one for gastrointestinal problems. [AR 164.] There are no corresponding records related to either referral.

On February 24, 2009, the ALJ held a hearing. At that time, Nevaeh was 1 year old, 11 months. [AR 159.] During the hearing, Hernandez described Nevaeh's premature birth and related problems. [AR 43.] Hernandez reported that Nevaeh continued to have gastrointestinal problems and

that she vomited a lot.  However, Hernandez did not know if the vomiting was due to digestive or behavioral problems. [AR 46.] Nevaeh continued to have problems sleeping. [AR 47.] She was always afraid of noises and lights. [AR 48.] She was behind in her speech and language skills. Hernandez was still waiting to get a neuropsych evaluation for Nevaeh. [AR 48.]

Hernandez described Nevaeh as playing with her brothers but being very aggressive to the point of throwing things at people, whether she was angry or happy.  She was "very mean."  She bit and scratched people and pulled their hair. [AR 49.]

Nevaeh would not sleep during the day or take naps.  She did not sleep well at night. [AR 51.] Hernandez described the various areas where Nevaeh was behind for her age. [AR 51-52.] In response to questions from the ALJ, Hernandez stated Nevaeh banged her head four to five times a day for no obvious reason. [AR 52.]

Nevaeh had a session with the OT that same day before the ALJ hearing.  Hernandez stated she was hammering some blocks and tried to hit the OT and threw a little hammer at him several times.  She also spat at him several times and yelled.  "That's a typical visit.  That's the way she is during all her visits." [AR 53.] There was no corresponding OT note in the administrative record.

Hernandez believed Nevaeh had been receiving therapy from the DT, ST, PT, and OT for about a year. [AR 56-57.] Nevaeh did not cooperate with her mother getting dressed or being bathed. She bit her mother when Hernandez tried to brush her teeth.  "She spits.  She'll kick.  She screams. I have to fight with her to do everything." [AR 57.] Nevaeh did not feed herself but did eat with her hands.  She threw food on the floor. [AR 58.] She was antisocial with other children and needed to be held a lot on a bad day. [AR 58.]  Nevaeh was unable to calm herself. [AR 59.]

Hernandez described Nevaeh as going "hysterical," if her mother closed a door in the house. She would bang her had, knock something over, spit or hit just because a door was closed. [AR 61.]

28

The ALJ asked Hernandez to provide him with a neuropsych evaluation if it was done in the near future. [AR 62.]

On October 9, 2009, the ALJ issued an adverse decision, finding Nevaeh was not disabled. [AR 18.] The decision is very detailed and thorough, as well as consistent with the three-step evaluation required for children under the age of 18.

On December 3, 2009, a lengthy developmental evaluation was provided by UNM School of Medicine, Early Childhood Evaluation Program ("ECEP"). [AR 522-542.] Nevaeh was 2 years, 8 months old. [AR 525.] The ECEP evaluation team consisted of an evaluation coordinator, a licensed psychologist, a physical therapist, and a doctor.  It was signed by the PT who visited Nevaeh. [AR 522, 523.] The evaluation addresses a number of areas of behavior and development and is comprehensive.  It is not clear, however, if or when Nevaeh was given a neuropsych evaluation.

The ECEP evaluation is divided into a number of categories as summarized below.

***Social-Emotional***: Nevaeh demonstrated a very short attention span and required considerable support to complete tasks.  Her mood ranged from happy to frustrated to disruptive. She exhibited emotional extremes, from happy to angry.  She used multiple forms of nonverbal communication.  "Overall, social-communication skills were intact." [AR 522, 524.]

***Play***: was very active and preferred active play.  Difficulty engaging in more complex play schemes.

***Self-Help***: per parents, her overall personal living skills are in the significantly delayed range (limited).

***Cognitive Abilities:*** low average range of functioning but she refused many tasks. [AR 524, 535.]

*Imitation:* overall, intact.

*Visual Problem-Solving:* below average range at the 24-month old level.  Difficult to test her due to her problems with sustained attention, task compliance, etc. [AR 524.]

*Verbal Problem-Solving:* test results in average range re: receptive and expressive language skills.

*Cognitive Impression:* age appropriate social-communication skills, play skills, imitation skills, and verbal problem-solving skills.  Visual problem-solving skills and self-care skills are delayed. [AR 525.] "Nevaeh's difficulties with motor over-activity and impulsive responding are consistent with ADHD-Predominantly Hyperactive-Impulsive Type." [AR 525.]

*Communication:* "delightful little girl who readily engaged with evaluators. . ."  She demonstrated a variety of developmentally appropriate social skills.  "Being a bright child, Nevaeh has also developed different controlling behaviors that interfere with her learning and social communication skills."  She is motivated to communicate.  Has difficulties actualizing communicative engagements. [AR 525.]

*Receptive Communication:* Could follow short, concrete directions.  Self-directed and needs control.  Inconsistent communicative processing.  Fluctuating attention abilities.  Receptive language skills are within normal range but with attention/regulation difficulties causing very inconsistent performance of previously demonstrated skills. [AR 526.]

*Expressive Communication:* Used multiple word phrases and complete sentences.  Used 100 different words during evaluation.  Her behaviors fit pattern of an attention/regulation disorder.  Demonstrating normal developmental skills in expressive communication but unable to use them consistently because of inconsistent processing. [AR 526.]

*Articulation:* Formal articulation testing not performed, but she passed the articulation screening.  Demonstrated some reduced speech intelligibility; other times speech was intelligible and within normal limits. [AR 526.]

*Oral Motor Skills:* Functional and age-appropriate.

*Communication Impression:* Showed she could be fun, engaging little girl who can use developmentally appropriate communication skills.  But, demonstrates a pattern that indicates difficulty consistently attending to and processing communicative information and learning. [AR 527.]

*Sensorimotor Abilities:*

    *Fine Motor Skills:* typical development.

    *Gross Motor Skills:* developing normally.

*Postural Control:* No issues noted.

*Sensory Processing Abilities:* Parents completed the testing paperwork.  Based on their reports, Nevaeh scored in the atypical range with significant issues in areas of detached, hyper-sensitive/active and dysregulated categories.  Overexcited in crowded settings.  Disturbed by light and noise and touching.  Easily upset and difficult to soothe.  Always refuses to do what she's told to do.  Cries too long.  Sleep irregular.  This description was provided by her parents.  During the assessment, she smiled and laughed some of the time.  She was self directed and overly active in her chair.  Over sensitive to touch. [AR 528.]

*Sensorimotor Impression:* Low average in fine motor skills and average in gross motor skills on testing.  No concerns observed.  Had more difficulty with fine and precise hand movements.

*Medical Evaluation (AR 529):* grown well, good appetite [AR 530]; Nevaeh's behaviors cause the parents the most concern.  Cries for hours and easily becomes angry. [AR 531.] She is aggressive. Does not sit to eat.  Does not sleep well. [AR 531.] Appears healthy and well nourished on exam. [AR 532.] She is in perpetual motion and moves rapidly.  Speech is rapid.  She was labile between angry and content. [AR 532.] Has positive family history of ADHD, learning disabilities and mental health diagnoses.  She is at medical risk for developmental delay and behavioral differences, particularly due to her prematurity. [AR 532.] She did very well today when tested. Nevaeh meets criteria for ADHD, despite that she is very young. [AR 533.] "Her behaviors are negatively impacting her ability to learn as well as impacting her and her family's quality of life." A sleep study is requested. [AR 533.] Appears to meet Part C definition of a child who is eligible to receive early intervention services due to an established condition of ADD/Hyperactivity. [AR 537.]

On December 8, 2009, Hernandez requested review of the ALJ decision. [AR 7.]

### *2010 Records*

On April 20, 2010, there is an APS Special Education Evaluation.  Nevaeh was about 3 years old.  APS reviewed the information from Baby Steps and the December 2009 full evaluation, along with her diagnosis of ADD/hyperactivity. [AR 166.]

On May 10, 2010, APS issued an eligibility determination for "Other Health Impairment." Nevaez met the criteria for "Other Health Impairment" with the ADHD diagnosis, so she met the special education eligibility under this one category.  This form shows her testing levels in terms of her age.  It appears that APS approved Nevaez for Medicaid preschool from August 2010 to May 2011. [AR 187.] Her diagnosis of ADHD interfered with her ability to participate in a school environment.

32

On August 11, 2010, the Appeals Council denied the request for review. [AR 1.] In so doing, it considered additional evidence, including the December 2009 evaluation and the APS evaluation. [AR 4.]

## V.   DISCUSSION

### A.   Alleged Legal Error

Nevaeh's argument for reversal or remand focuses on whether the ALJ's functional equivalence findings at step 3 were supported by substantial evidence. She does not take the position that her limitations met or equaled a listing, nor does she challenged credibility findings by the ALJ.

Nevaeh first argues that during the time Nevaeh was age 0-1, the ALJ's finding that she had a marked impairment in the domain of health and physical well-being was not supported by substantial evidence. [Doc. 17, pp. 4-5.] She argues that the impairment in this domain actually should been deemed extreme. Even if the Court disagrees, Nevaeh also asserts that she should be found disabled in the first year of life because her ability to care for herself and to move about and manipulate objects resulted in marked limitations. [Doc. 17, p. 6.] In other words, the ALJ's findings that she has less than marked impairments in these two domains were not supported by substantial evidence. [Doc. 17, p. 9.] Nevaeh further contends that the ALJ mistakenly relied on a report dated 4/30/07, for examining limitations in the 0-1 age range, when the report should actually have been dated 4/30/08. Because the ALJ did not discuss the report for the appropriate age range, Nevaeh claims remand is appropriate so the case can be re-analyzed in the appropriate age category. [Doc. 17, p. 12.]

Nevaeh next asserts that from age 1-present, that substantial evidence supported a finding of an extreme limitation in the domain of interacting and relating with others, as opposed to the

33

marked limitation found by the ALJ.  Nevaeh disagreed with a number of the ALJ's findings in other domains during this age category as well.  She requests that the Court reverse for immediate payment of benefits for the two time frames discussed.  In addition, she asks for a remand to make a finding of disability for the new age category that Nevaeh has passed into since the ALJ's decision. [Doc. 17, pp. 19-20.]

The Commissioner argues generally that in 2000-2001, after the final revised regulations for childhood disability were enacted, a child's impairment or combination of impairments must cause more serious impairment-related limitations than the earlier laws and regulations required. [Doc. 18, p. 4.] In addition, the Commissioner asserts that Plaintiff's primary strategy is to ask the Court to reweigh the evidence in her favor when the ALJ already issued a substantially supported and legally correct decision.  More specifically, the Commissioner contends that many of Plaintiff's arguments assert that the ALJ should have found Nevaeh's impairments met the next most serious category than the one that the ALJ found supported by substantial evidence.  According to the Commissioner, this difference in "degree" of impairments would amount to reweighing the evidence which the ALJ cannot do.

Plaintiff disagrees that she seeks the Court to improperly reweigh the evidence.  Instead, she argues that the ALJ committed legal error in evaluating the evidence. [Doc. 19.]

B.    Analysis

1.    **Birth-1 Year Old Time Frame:**

Hernandez argues that the ALJ's findings in three of the six domains were not supported by substantial evidence: (1) health and physical well being; (2) ability to care for herself; and (3) ability to move about and manipulate objects.

a.   ***Health and Physical Well Being***

Hernandez contends that in the domain of health and physical well being, the ALJ's finding of a marked limitation was not supported by substantial evidence and that there was substantial evidence to support a finding of an extreme limitation in this domain.

In support of this position, Hernandez cites part of a CFR regulation stating that a limitation is extreme if "you are frequently ill because of your impairment(s) or have frequent exacerbations of your impairment(s) that result in significant, documented symptoms or signs substantially in excess of the requirements for showing a 'marked' limitation . . . ." 20 C.F.R. § 416.926a(e)(3)(iv).

Hernandez omitted the portion of this CFR regulation that defines "frequent" as meaning episodes of illness or exacerbations that occur on average of three times a year or once every four months, each lasting two weeks or more. 20 C.F.R. § 416.926a(e)(2)(iv).[6] She also did not mention that the regulation further states that the Commissioner _may_ consider the applicant to have an extreme impairment should the requirements be met. In other words, it is not an automatic finding.

Hernandez summarily argues that Nevaeh was "frequently" ill and that her documented signs and symptoms are "well-recorded." She does not argue that those symptoms or signs "substantially exceeded" the requirements of a marked limitation. [Doc. 17, p. 5.] Instead, she recites the various problems Nevaeh had, particularly during the initial few weeks after her early birth.

The ALJ discussed the same symptoms and documented signs in significantly more detail than Hernandez. For example, he noted that while in the hospital after birth, Nevaeh spent four days on a ventilator, followed by the use of a CPAP machine for two days. She suffered on episode of

---

[6]The definition of "frequent" is found under the discussion of "marked" limitations. However, the same definition appears applicable to the discussion of "extreme" limitations, as the documented symptoms of an extreme limitation must exceed those for showing a marked limitation.

bradycardia and her last episode of apnea on April 29, 2007.  She was weaned to room air and treated for a large PDA. [AR 26.] Nevaeh's discharge from the hospital occurred when she was alert, active, and in no distress.  Testing indicated normal lungs and chest.  She could move all her extremities and weighed 6 pounds and 9 ounces.  She had responded well to conservative treatment. Her necrotizing enterocolitis did not require surgical intervention.   Nevaeh passed a hearing screening test and later vision tests. [AR 27]

However, because of Nevaeh's continuing GERD and treatment for it, the ALJ found that there was a marked limitation in this domain.  The state agency doctor agreed, finding the same marked limitation. [AR 222.] Several months later, another state agency doctor found a less than marked limitation in this domain. [AR 314.]

The Court concludes that there is substantial evidence for the ALJ's marked limitation in this domain and disagrees with Hernandez's position that the limitation should have been evaluated as extreme.  She fails to identify record evidence of that Nevaeh was "frequently" ill as defined by the regulations during this time frame, *i.e.,* records that demonstrated "episodes of illness or exacerbations that occur on average of three times a year or once every four months, each lasting two weeks or more."  While Nevaeh had multiple complication from the preterm birth, most of them resolved quickly and with conservative treatment.  Moreover, Hernandez's position that her birth weigh alone should have demonstrate functional equivalence to a listing, *see* 20 C.F.R. § 416.926a(m)(7), is unavailing because the regulations further clarify that as with any disabling impairment, the duration requirement, *i.e.,* 12 months, must also be met.  Nevaeh's weight increased appropriately, according to the medical records.  For example, as of September 5, 2007, Nevaeh was noted as feeding orally and gaining weight appropriately. [AR 346.]

Hernandez failed to identify substantial evidence in the record that the ALJ erred in not finding an extreme limitation in this domain.

### b.   *Ability to Care for Herself*

Hernandez argues that substantial evidence supported a finding of a marked limitation in this domain, as opposed to the ALJ's determination that Nevaeh had no limitation. [AR 25-26.] In support of her position, Hernandez identified records when she reported to care providers that Nevaeh cried for more than an hour every day, fought sleep, and did not like noise or lights.  [AR 239.] A speech-language pathologist wrote in October 2007 that Nevaeh needed developmental monitoring and developmentally supportive care because she had extremely long period of crying, difficulty sleeping and difficulty with self-calming.

Hernandez listed records showing the parents' complaints as well as clinical observations during this period. [Doc. 17, pp. 7-8.] For example, these records indicate that Hernandez found Nevaeh was agitated, took too long to feed, and did not comfort easily. [AR 350.] The parents were concerned about prolonged periods of crying and Nevaeh's inability to calm herself, as well as her difficulties falling asleep.  Some of the clinical observations cited included Nevaeh's trouble calming herself, hyper-alert responses to auditory and visual stimuli, over-stimulation to surroundings, and lack of self reliance.

The ALJ noted that this domain considers how well a child maintains a health emotional and physical state, including how well a child satisfies her physical and emotional wants and needs in appropriate ways.  The regulations further provide that a young infant without an impairment in this domain should be able to recognize her body's signals (hunger, pain, discomfort) so as to alert her caregiver to her needs (by crying) and to console herself (sucking on her hand) until help comes.

The ALJ further noted the speech-pathologist's record from May 2007, in which the therapist noted that Nevaeh was tolerant of handling for her cares.  While there were concerns about her overly alert state after feedings, this appeared to be related to excess stimulation and activity.  Her adaptive/self-help states were evaluated: "Nevaeh is bottle and breast feeding well.  She has active non-nutritive sucking and takes a pacifier as well as getting hands to mouth demonstrating attempts to self console." [AR 357.] She was awaking at regular 3 hour intervals and feeding.  She "progressed steadily and is now doing well."  While the ALJ did not discuss every sentence in this report, he clearly relied on it. [AR 26.]  He also relied on the consulting physician's report from August 2007, finding no restrictions in Nevaeh's ability to care for herself. [AR 26.]

While there is no doubt that Nevaeh had problems with self calming, maintaining composure, feeding patterns, sleeping, and crying during this time frame, there is also evidence that the parents stated Nevaeh was growing well.  She loved to play with her brothers and laughed and smiled at them. [AR 340.] As of March 19, 2008, the therapists observed that Nevaeh was doing well since her hospital discharge and that her parents had done a good job maintaining her health and an environment that provided development enrichment. [AR 335.] She was visually aware and responsive to others, used fussing sounds, and reached for attention and support with her arms. [AR 335.]

The Court concludes there was substantial evidence in the record to support the ALJ's findings.  Moreover, the Court will not reweigh the evidence, even if it might reach a different conclusion as to this domain.[7]  See Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (court

---

[7]The Court observes that during this first year, there were repeated no shows and cancellations by the parents which prevented patient care. [AR 340.] At one point, Nevaeh's enrollment in the early intervention program was dropped due to failure to attend or be present for scheduled appointments. [AR 342.] However, the services were reinstated.

may not reweigh the evidence nor substitute its decision for that of the Commissioner); *see also* Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (citation omitted); Hilson v. Barnhart, 64 F. App'x 134, 136 (10th Cir. Apr. 21, 2003) (court does not reweigh evidence where record contains evidence both positive and negative about a claimant's concentration problems; thus, determination that a limitation was marked was not compelled by such varied evidence).

c.    ***Ability to Move About and to Manipulate Objects***

The ALJ found that Nevaeh had a less than marked impairment in this domain.  Hernandez argues that the finding is contrary to substantial evidence of record and that the ALJ was improperly "selective" in his review of the record.  Hernandez asserts that the evidence showing Nevaeh became upset with new experiences and changes of positions and her delayed motor skills and inability to roll or sit independently is substantial evidence of a marked limitation in this domain.  [Doc. 17, pp. 9-10.]

The ALJ first discussed the domain in terms of what it addresses – how well a child is able to move her body from place to place and how a child moves and manipulates objects, including gross and fine motor skills. [AR 25.] The ALJ further cited regulations that provided a young infant without an impairment should begin to explore the world by moving her body and using her limbs. She should learn to hold up her head, sit, crawl, and stand.  She should begin to develop eye-hand control by reaching for objects. [AR 25.]

In determining that Nevaeh had a less than marked limitation in this domain, the ALJ specifically relied on the speech language pathologist's report from May 2007, a subsequent

examination by Presbyterian Family Health Care, and on the consulting physician's similar findings. [AR 25.]

In reviewing the records specifically relied upon by the ALJ, the speech language pathologist noted in May 2007 that "Nevaeh's movements were fairly smooth, with a variety of extensor and flexor movements.  Postural muscle tone was typical for an infant of her gestational age, in the low average range.  She tolerates side lying, back lying and stomach positions as well."  [AR 213.] In late July 2007, the Presbyterian provider observed that Nevaeh lifted her head, sat with support, and could bear weight on her feet.  She was further described as a well 4 month old child. [AR 213.]

Based on a record review in August 2007, Dr. Aase, concluded there were no limitations in this domain. [AR 314-17.] One record, as of the date of his review, indicated that Nevaeh demonstrated antigravity head control and appeared to be developing in a typical manner. [AR 350-51.]

Similar to the discussion above, there is evidence of record indicating that Nevaeh was having difficulties with her sensorimotor/neuromotor skills during this time frame. [AR 347-48.] She did not like to lie on her stomach and roll, and showed delayed motor skills. [AR 340-41.] Nevaeh had problems sitting, although she was under a year old at this time. [AR 340.] On March 19, 2008, her motor delays were described as mild.  At an adjusted age of ten months old, Nevaeh's sensorimotor/neuromotor skills were assessed as typical of an eight month old. [AR 335-36.] However, she was able to stand with help and step towards her parents. [AR 337.] Her use of hands to explore was expected to improve with more stability in sitting.  Her gross and fine motor skills were evaluated as "mildly to moderately" delayed in March 2008. [AR 337.]

Again, while the Court might find evidence to support a marked limitation in this area, it will not reweigh the evidence as this is not the Court's function.  The Court concludes that there is

substantial evidence in the record to support the ALJ's findings with respect to this domain in Nevaeh's first year of life.

In her motion, Hernandez also argued that the ALJ "misread critical evidence" by relying on Exhibit 12F in evaluating Nevaeh's functioning from birth to age one. [Doc. 17, p. 10.] Exhibit 12F contains several documents, including clinical notes by PT Maidment for an initial developmental evaluation, dated 4/30/08 [AR 362] and a more formal evaluation summary, also signed by Maidment [AR 365.] The latter evaluation summary was mistakenly dated April 30, 2007, instead of April 30, 2008.  It is obvious this was typographical error both because the referral date was April 11, 2008 and because of the 4/30/08 notes.  [AR 362, 365.] Hernandez observes that the ALJ referenced Ex. 12F, a 2008 evaluation, in his assessment of Nevaeh's functioning, etc. in the first year of her life.  However, while true, the ALJ does so only in domains that Nevaeh did not challenge, *i.e.,* ability to interact with others and acquiring and using information. [AR 23, 24.] The Court, therefore, does not address whether the ALJ misread critical evidence in these domains.

Hernandez also asserts that the ALJ did not discuss this 2008 evaluation in the part of the decision describing Nevaeh's abilities from age one to present. [Doc. 17, p. 11.] This is not entirely accurate.  The ALJ referenced Ex. 12F on virtually every page of his decision for the second time frame (1 year old to present).  [*See* AR 28, 29, 30, 31, 32, 33.] However, he was relying on Maidment's less formal notes instead of the mis-dated summary evaluation.  Both were prepared by Maidment and both contain close to the same information.  Thus, Hernandez did not demonstrate any error by the ALJ's consideration of Ex. 12F.

2.      1 Year Old to ALJ Decision Date (about 2½ Years Old)[8]

Hernandez argues that the ALJ's findings in three of the six domains were not supported by substantial evidence: (1) interacting and relating to others; (2) moving about and manipulating objects; and (3) caring for herself.

a.      *Interacting and Relating to Others*

The ALJ determined Nevaeh had a marked limitation in this domain, after extensive discussion of the records. [AR 29-30.] Hernandez argues that there is substantial evidence to support an extreme limitation in this domain rather than a marked limitation.

The ALJ described this domain as considering how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possession of others. [AR 29.] The ALJ further recited pertinent regulations providing that an older infant/toddler without an impairment in this domain is dependent upon caregivers but should begin to separate from them. The child should be able to express emotions and respond to others' feelings.  The child should begin initiating and maintaining interactions with adults, but also show interest in and play with children of the same age.  The child should be able to spontaneously communicate her wishes or needs by gestures and eventually through words. [AR 29.]

The ALJ first discussed the initial evaluation notes from April 30, 2008.  The therapist noted that Nevaeh mimicked and laughed out loud with her brother.  [AR 362.]  The therapist observed that Nevaeh was visually attentive to people and toys. [AR 362.]  She responded to her name being

_____

[8]Hernandez argues that this time frame runs from one year old to three years old. [Doc. 17, p. 12.] However, the ALJ's decision was issued on October 9, 2009. [AR 35.] Nevaeh was born in March 2007. Thus, she might be considered either 31 months old as of Oct. 2009, or 29 months old if the age is adjusted to the due date in May 2007.

called and looked in the direction of sounds.  The PT assessed Nevaeh with a social-emotional functional level score of 9 months, which was below average at this point when Nevaeh's adjusted age was about 11 months.

The ALJ also relied on an April 16, 2008 neurodevelopmental evaluation by UNM health practitioners.  Nevaeh's adjusted age was 10 months, 22 days. [AR 331.] Under the category of behavior/social emotional, she was described as a "sweet and curious little girl who has a strong will." [AR 331.] She cried loudly and threw herself back in order to protest.  She was beginning to understand the meaning of "no."  She could be distracted from her tantrums by changing an activity, moving to another area, or ignoring the behavior.  Her early communication and problem solving skills were progressing.  Her motor skills continued to be delayed. [AR 332.]

The ALJ proceeded to discuss a number of therapy records, including an August 2008 record where the OT reported Nevaeh had "frequent and severe" episodes of agitation on a daily basis with prolonged tantrums lasting several hours. [AR 30, 361.]

The many therapy records during this time frame are extremely variable.  Some show episodes of agitation while others describe sessions where Nevaeh engaged quickly with the therapist and the periods of agitation were brief. [AR 469, 472, 475, 479.]  On August 12, 2008, for example, the developmental specialist encouraged Hernandez not to worry so much about "every little thing" Nevaeh was or was not doing. [AR 473.] Hernandez reported that Nevaeh continued to demand attention and have tantrums, but that behavior was not always observed during therapy sessions. [AR 468, 471.]  *See, e.g.,* 4/28/08 DT record (Nevaeh called uncle by name; improving language skills) [AR 389]; 4/30/208 PT record (parents concerned about neediness, inability to calm self, and frequent vomiting; Nevaeh observed to mimic and laugh out loud with brother) [AR 362]; 8/6/08 OT record (calm throughout most of session; brief episode of agitation; able to calm self in

43

a few minutes) [AR 479]; 8/8/08 DT record (engaged quickly; showed great interest with toy) [AR 475]; 8/13/08 OT record (no significant episodes of agitation; not shown a significant behavior episode during recent therapy session; fine motor skills improving) [AR 472]; 8/15/08 DT record (mom reports language skill problems and questions if she has stutter; speech therapist said vocalizations normal for her age; mom reports baby continued to have tantrums; therapist wished to continue to work with mom in reading Nevaeh's cues) [AR 471]; 8/19/08 PT record (Nevaeh in good spirits and cooperative; mom reports she yells when she wants something and is doing that to the point of vomiting) [AR 470]; 8/20/08 OT record (irritable at times, but mostly in good mood; no lasting episodes of agitation; mom reports frequent vomiting; therapist observed incident of gagging but visible decrease in irritation after introduction of music) [AR 469]; 8/22/08 DT record (happy, playful, independent play; mom concerned with possible stutter) [AR 468]; 8/26/08 PT record (good spirits; visually attentive to aquarium exhibits; independent ambulation) [AR 467]; 9/2/08 PT and DT records (very upset during eye exam; helped hold kicking legs) [AR 462-64]; 9/3/08 OT record (good mood, no indication of agitation, improved coordination, calm throughout session [AR 461]; 10/7/08 PT record (jabbering, laughing, cooperative, fearless, dancing; when frustrated, bites, scratches, pinches, hits) [AR 438]; 10/20/08 DT record (engaged quickly, laughed and fell back, unable to focus for long, very sociable) [AR 430]; 10/21/08 PT record (intermittently irritable; mom reports aggressive for no obvious reason, afraid of noises) [AR 429]; 10/22/08 OT record (calm, good mood; progress in ability to tolerate aversive objects) [AR 428]; 10/28/08 PT record (initially upset, crying, not feeling well; spontaneously kissed PT's leg, waved and said hi; more focused) [AR 427]; 11/08 therapy visits (head banging and screaming observed) [AR 414, 415, 416, 421]; 12/1/08 ST record (more calm and focused; no head banging) [AR 411]; 12/3/08 OT record (good mood and engaged readily; good response to stimulation) [AR 409]; 12/4/08 DT record

44

(head banging; yelled) [AR 406, 407]; 12/8/08 DT record (good spirits; did not cry or scream) [AR 405]; 12/17/08 OT record (readily engaged in therapy; no agitation; no anxiety) [AR 401]; 12/22/08 ST record (moody, hardly participatory, temper tantrum, gagging, upset and unable to redirect) [AR 394]; 12/29/08 ST record (no signs of distress, participated in play; best session in a month; happy) [AR 393].

Notwithstanding the varied day-by-day reports as to Nevaeh's behavior by her many therapists, the ALJ found a marked limitation in this domain because of Hernandez's health care providers' reports of severe temper tantrums, episodes of agitation, vomiting one to two times a day, "very fussy" behavior, a diagnosis of a behavior problem, and Hernandez's testimony at the hearing that her daughter was "real" aggressive and threw things, bit others, pulled others' hair, and scratched others.  The ALJ also considered reports that Nevaeh sometimes banged her head four to five times a day, did not cooperate getting dressed, and had difficulty sleeping. [AR 30.]

In her motion, Hernandez recites the same conduct considered by the ALJ, including vomiting, head banging, inability to express her emotions appropriately. [Doc. 17, pp. 14-15.] Hernandez also argues that an evaluation in December 2009 supported an extreme limitation.  The December 2009 report was prepared and issued after the ALJ's decision, but was provided to and considered by the Appeals Council.  Hernandez focused on parts of the report that stated when frustrated, Nevaeh tended to move away from the activity or examiner. [AR 522.] Hernandez also emphasized a part of the report that indicated it was "difficult for Nevaeh to play with peers due to the unexpected unstructured nature of interaction found with young children. . . . ." [AR 525.]

However, other portions of the December 2009 report stated that Nevaeh used multiple forms of nonverbal communication.  She was "clearly aware" of others and responsive to others.  Her social-communication skills were intact. [AR 524.]  Her receptive and expressive language skills

45

were in the average range.  She was a delightful little girl, who readily engaged with the evaluators. "She was able to demonstrate a variety of developmentally appropriate social skills.  She gave objects to others, pointed to objects . . ., showed objects to others." [AR 525.] Nevaeh smiled and checked in with her parents and others regarding her performance. [AR 525.] "Reports indicate that Nevaeh has recently made some improvements in social communication and learning style skills." [AR 525.]

Thus, while at times Hernandez accuses the ALJ of improperly "picking and choosing" from the medical records, her argument indicates she, too, selectively uses the records when some portions support her position.

The Court concludes that there is substantial evidence to support the marked limitation in this domain, whereas there is not substantial evidence to support an extreme limitation.  Even if the Court were to find otherwise, it will not reweigh the evidence for the reasons stated above.

b.      ***Moving About and Manipulating Objects***

The ALJ found Nevaeh had a less than marked impairment in this domain.  Again, the ALJ engaged in a thorough discussion of a number of records.  [AR 31-32.] He noted first that the domain considers how well a child can move her body from place to place and how well a child moves and manipulates objects and discussed pertinent regulations.

Hernandez cited a few records as evidence that Nevaeh had consistently exhibited delays in this area, and some records support the position that Nevaeh had delays, for awhile, in this domain. *See, e.g.,* AR 340 (delayed in motor skills); AR 335 (mild motor delays but enjoys standing and stepping towards parents with hands held); AR 331 (previous evaluations showed delayed gross and fine motor skills); AR 427 (immature run); AR 496 (at age 22 months she was assessed at a 17 month old level for gross motor skills).

46

However, many records indicate Nevaeh was progressing all right or well during this time span and that any delays did not last 12 months or more. *See, e.g.,* AR 365 (transfers items from hand to hand; drops objects to watch them fall; dances to music); AR 330 (mildly diminished use of hands to explore and play with toys; took a couple of crawling motions; sitting balance improved; tends to fall to side; strong desire to move and be walked; could place herself in sitting position at times); AR 472 (fine motor skills improving in Aug. 2008); AR 457 (ambulation up and down ramps and steps independently); AR 461 (showing improvement in fine motor coordination on September 2008); AR 459 (not fearful swinging); AR 458 (walked length of balance beam with one hand held; independent stepping over broom); AR 449 (physical therapist said Nevaeh had made progress over four months and no longer needed as much physical therapy); AR 448 (fine motor performance improving); AR 441 (started to run and kicked ball); AR 438 (walks off sofa, dances); AR 429 (independent ability to step up on beam and stand on it); AR 421 (did somersaults); AR 388 (danced); AR 151-155 (per mother can stand, walk, and run); AR 527-28 (gross motor skills developing normally as of December 2009; ran, climbed, jumped, threw and kicked a ball, balance well developed, controlled posture).

The ALJ expressly discussed a number of these records.  The Court concludes that substantial evidence supports his finding that there was a less than marked impairment in this domain.  The Court disagrees that there is substantial evidence of a marked impairment for the required duration.

c.    ***Caring for Herself***

The ALJ found that Nevaeh had a less than marked restriction in her ability to care for herself during this time frame. [AR 32-33.] In so finding, he relied on records showing she could hold her own bottle, feed herself when hungry, and finger feed herself.  The ALJ considered

47

Hernandez's testimony at the hearing that Nevaeh was not able to dress herself but found that dressing oneself was not an age-appropriate activity for a two-year old. [AR 32.]

Hernandez argues that there is substantial evidence to support a marked or extreme restriction in this domain. She first relies on the OT's August 19, 2008 letter addressed to whom it may concern. [AR 361.] In the letter, the OT noted Nevaeh presented with fine motor delays and showed greater than normal dependence on her caregivers to calm herself. The OT also commented on Nevaeh's acute intolerance to many sounds, frequent and severe episodes of agitation and prolonged tantrums. [AR 361.]

The August 2008 letter is somewhat of an anomaly when viewed in the context of the OT's treatment records around this date. First, Hernandez asked the OT to write a letter explaining the purpose and goals of OT. [AR 472.] The OT provided a letter identifying Nevaeh's many problems and stating he had seen Nevaeh on a weekly basis since June 25, 2008.[9] Yet, his records regarding actual treatment during this time frame show fine motor skills were improving and that Nevaeh had not had a significant behavior episode during recent therapy sessions [AR 472]. This session, dated August 13, 2008, was just six days before he wrote the letter indicating many problems. On August 20, 2008, the OT stated there were no lasting episodes of agitation. [AR 469.] On September 3, 2008, the OT observed Nevaeh to be in a good mood with no agitation. She was showing improvement in fine motor coordination and was calm. [AR 461.] On September 24, 2008, Nevaeh demonstrated occasional anxiety but was mostly calm. She habituated to anxiety producing stimuli and approached the objects. [AR 445.] On October 1, 2008, Nevaeh showed minimal signs of

---

[9]The first OT record (in the AR) by this therapist is dated August 6, 2008, when he stated Nevaeh was calm through the majority of the session with a brief period of agitation. She was able to calm herself in a few minutes. [AR 479.]

aversion toward several aversive stimuli. [AR 440.] On October 8, 2008, the OT noted Nevaeh was calm and showed improvement in her overall anxiety. [AR 437.] On October 22, 2008, Nevaeh continued to show progress in occupational therapy sessions. [AR 428.] A week later, she had more problems. [AR 426.] However, by November 5, 2008, she demonstrated some improvement again. Her fine motor coordination was showing gains too. [AR 422.] On November 12, 2008, Nevaeh had demonstrated improvement in the ability to insert shapes into holes, according to the OT. [AR 420.]

Hernandez also relied on records where a speech language pathologist recommended the intensive AIT therapy for Nevaeh's disordered speech and language abilities. [Doc. 17, p. 17; AR 383.] The speech pathologist noted that Nevaeh exhibited auditory defensiveness in addition to disordered speech and language abilities. [AR 383.] She diagnosed Nevaeh with impairment of auditory perception and recommended an intensive two-week program (AIT) designed to strengthen and balance the auditory system.  While Hernandez cites these records, it is not clear that they directly relate to this domain, *i.e.,* in other words, Nevaeh's ability to care for herself.

In addition Hernandez cited the December 2009 evaluation performed by a team of therapists.  Again, the ALJ did not have this report at the time he issued his October 2009 decision, although it was presented to the Appeals Council.  Hernandez asserts that the evaluation showed Nevaeh, at the age of 2 years, 8 months continued to be "severely delayed, that is, lower than 1st percentile, in her capacity to monitor and control her own behavior." [Doc. 17, p. 18.] The Court could not locate this exact language at the page cited [AR 237], although that page of the report indicates Nevaeh's Temperament and Regulatory Index was at the less than 1 percentile indicating atypical behavior.  [AR 237.] The overall impressions of Nevaeh's development were that she "actually did very well" during testing, although she was "extremely self-directed and required a lot

of structure and reinforcement to be able to participate in testing." [AR 538.] The examiners concluded she met the criteria for a diagnosis of ADHD, despite how young she was.

Hernandez relied on therapy notes from August 2008 through January 2009 as well, documenting Nevaeh's irritability, sleep problems, head banging, object throwing, screaming, gagging, and vomiting. Again, the therapy records during this period are mixed. At times, therapists reported she was calm, doing well, and able to calm herself in a few minutes when irritated. [*See, e.g.,* AR 437, 458, 461, 469, 472, 479.] She engaged with therapists quickly and exhibited more focused behavior. [AR 439, 446, 448, 449, 452, 459, 460 465, 467, 468, 473, 475.] However, Hernandez's reports were frequently to the contrary – that Nevaeh was yelling to the point of vomiting. [AR 429, 470.] In addition, some of the therapy records, both before the move but particularly for a period after the family's move to a new home, documented behavioral issues. [*See, e.g.,* AR 413, 414, 415, 418, 419, 421, 422, 424, 425, 426, 431, 433, 438, 452.]

In early 2009, Nevaeh was ill and some sessions were canceled. However, the notes from therapy records during this time frame show some improvement and less irritability. [AR 386, 387, 388.] In contrast, her mother described her as behaving like a "monster." [AR 385.] While Dr. Napoleone referred Nevaeh to Dana Hill for a neuropsych evaluation, as of February 9, 2009, and referred the family to Joelle Haldeman-King for counseling, it is not clear from the records whether the family followed up on either referral. [AR 496-97.]

In reviewing the evaluation with respect to the self-help category, the therapists observed that Nevaeh's self-help skills were assessed via parent report. According to her parents, Nevaeh's overall personal living skills were significant delayed with delays reported in eating, toileting, dressing, self-care, and domestic skills. [AR 524.]

The Court observes the records during this time frame are variable.  Clearly, behavioral issues are documented.  On the other hand, there are many records showing improvement by Nevaeh in a number of areas.  The Court concludes that substantial evidence supports the ALJ's finding of a less than marked limitation in this domain for the time frame examined.  The Court rejects Hernandez's argument that substantial evidence supports a finding of a marked or extreme limitation in this area.  Even if it were to find such evidence exists, it will not engage in reweighing the evidence.

In Hernandez's motion, at the beginning of her argument regarding this age range, she summarily claimed that Nevaeh had a marked to extreme limitation in a fourth domain, that of health and physical well being.  However, while stating she would discuss this further in the motion, she did not do so. [Doc. 17, p. 12.] The Court, therefore, does not examine this unsupported argument.  Moreover, the Court concludes there was substantial evidence, as outlined by the ALJ, for his finding of a less than marked limitation in this domain. [AR 33-34.]

VI.     **CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff Hernandez's motion for remand is denied, that the complaint is denied, and that this matter is dismissed, with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge